# Ross Common Water Company *v.* Blue Mountain Consolidated Water Company, Appellant.

*Equity—Equity practice—Preliminary injunction—Appeal—Review.*

1. The established practice of the court on an appeal from the granting or refusal of a preliminary injunction is to withhold any expression of opinion on the merits of the controversy until after final hearing and decree and to determine only whether on the facts developed an injunction should have been granted or refused.

2. A preliminary injunction will issue against a water company to enjoin it from operating certain of its artesian wells, where it is definitely established that by the operation of these wells a large spring whose waters are used by its owner for commercial purposes, is rendered entirely dry.

Argued March 9, 1910. Appeal, No. 380, Jan. T., 1909, by defendant, from decree of C. P. Monroe Co., Sept. T., 1909, No. 12, continuing preliminary injunction in case of Ross Common Water Company v. Blue Mountain Consolidated Water Company. Before FELL, C. J., BROWN, ELKIN, STEWART and MOSCHZISKER, JJ. Affirmed.

Bill in equity for an injunction.

On a motion to continue a preliminary injunction, STAPLES, P. J., found the facts to be as follows:

In the year 1883, Charles Brodhead became the owner of a tract of land in the township of Ross, county of Monroe and state of Pennsylvania. At the foot of the main range of the Blue Mountains, on the north side, a few feet above the Aquashicola creek, there has been for many years a spring of pure water. In the year 1889, the said Charles Brodhead commenced to take the water of this spring and sell it in the towns south of the Blue Mountains, and afterwards to carbonate it and make mineral waters, which sale and use have been continued without a break from that time to the present, the business having been taken over by lessees until it finally came into the hands of the Ross Common Water Company,

incorporated under the laws of Pennsylvania, with a capital of originally $3,000, increased afterwards to $50,000, of which amount between $22,000 and $23,000 have been paid in; the said company having, in connection with the operation of its business, a large frame building, two and a half stories high, about forty by sixty feet in dimensions, fitted with the machinery necessary for the purposes of the manufacture of said waters as aforesaid; the said waters being shipped to New York, Philadelphia, Pittsburg and the leading towns within the county of Northampton. In connection with its manufacture, the persons interested did considerable advertising, both by circular and leaflets, photographs having been taken of the spring, transferred to the leaflets and these largely disseminated, until it has established a business of about 8,000 gallons per annum of pure water, and about 8,000 gallons of aërated and other mineral waters.

The water of the said spring is confined by a stone wall built around it (with an overflow), between four and five feet wide and about twenty-three inches in depth. No diminution was ever observed in the flow of the said spring until about November 5 or 6, when it was noticed to have gone down a couple of inches.

In the year of 1903, the Blue Mountain Consolidated Water Company was incorporated under the laws of the state of Pennsylvania, in which were merged the following water companies, viz.: Nazareth Water Company, incorporated for the purpose of supplying water to the borough of Nazareth, county of Northampton, state of Pennsylvania; the Wind Gap Water Company, incorporated for the purpose of supplying water to the borough of Wind Gap, and the Pen Argyl Water Company, incorporated for the purpose of supplying water to the borough of Pen Argyl.

Previous to the incorporation of this defendant company, and the merger of the said last three mentioned water companies, the Pen Argyl or the Wind Gap Water Company acquired the right to take from one of the

streams of Ross township, on land within a short distance of the said Ross Common spring, water thereof to the amount of about 400,000 gallons per day, which was carried over the Blue Mountain to the said boroughs of Wind Gap and Pen Argyl; but, evidently being insufficient for the needs of the said boroughs before mentioned, which all lie on the south side of the said Blue Mountain, the said defendant company acquired a tract of land containing nine acres and eighty-four perches, and adjoining the land upon which is situate the said Ross Common spring.

Upon this tract of land were erected a pumping station, a reservoir, etc., and there were sunk three artesian wells, known as No. 1, No. 2 and No. 3; No. 1 being 240 feet from said Ross Common spring, No. 2 being 520 feet therefrom, and No. 3 being 380 feet therefrom; No. 1 being 187 feet in depth, No. 2, 227 feet in depth, and No. 3, 262 feet in depth; the diameter of the casing and pipe in No. 1 being, respectively, six and four inches, and in Nos. 2 and 3 being, respectively, ten inches and six inches. No. 1 was sunk in the fall of 1907 and winter of 1908, and commenced to be operated in the summer of 1908; No. 2 was sunk in the fall and winter of 1908 and 1909 and commenced to be operated in the spring of 1909; and No. 3 was sunk in the winter of 1909, and commenced to be operated in the summer of 1909.

The water from these wells was pumped or forced out by compressed air, run into a reservoir and pumped over the Blue Mountain and then distributed by main pipes to the inhabitants of the boroughs of Wind Gap, Pen Argyl and Nazareth, and also to the inhabitants of three outlying townships, quarries and cement mills, for drinking and domestic purposes and also for manufacturing purposes, the amounts distributed to the persons, cement mills, etc., in the territory in proximity to Nazareth, but outside of its borough limits, being about equal to the amount used in the borough proper, it being stated by one of the officers of the company that about 400,000 gallons were

needed for the borough and about 400,000 gallons for the
territory in proximity thereto.   There was also a large
quantity of the water used in the territory in proximity
to the borough of Wind Gap and Pen Argyl, but outside of
the borough limits.   If the water supply were shut off from
the cement mills, slate quarries and the various customers
outside the three boroughs, there would be sufficient sur-
face water derived from the stream dammed in Ross town-
ship to supply the inhabitants of the said three towns,
and the sinking of the wells and pumping the water from
beneath the surface was due to the distributing water be-
yond the territory provided for by its articles of incor-
poration.

After these wells were sunk and placed in operation,
they were used continuously from that time until the
hearing had in this case on an application for a prelim-
inary injunction November 12, 1909,—not all at the
same time, but, as we remember the testimony, always
at least two of them.   The said Ross Common spring
after November 5 or 6, continued to decrease in volume
until it was completely dry, which was the condition of
the same at the time of said preliminary hearing above
stated; and in the immediate neighborhood of this spring
where the ground was wet and where there were evi-
dences of other springs, the ground was dry and these
springs also.

Upon one of the officers of the defendant company
being notified of the condition of the Ross Common
spring, that is to say, its decreasing in volume, pumping
which had been going on at No. 1 and No. 2 was stopped
at No. 1 and the waters in the spring came up almost at
once, but the pumping continuing on No. 2, the spring
shortly thereafter went entirely dry.

At the suggestion of the court, the defendant company
agreed to cease pumping from its said three wells, Nos. 1,
2 and 3, from six o'clock P. M., November 13, 1909, to
six o'clock A. M., November 15, 1909, for the purpose of
making a test as to whether or not the pumping from

said wells did divert the water from the spring of the plaintiff company. Two persons were appointed by the court to make the tests every hour and also to see that no pumping was done. The result of this test was that the pumping of the said three wells ceased at six o'clock P. M. November 13:

| At | 6.45 | P. M. | there | was | 1 | inch | of water in the spring |
|---|---|---|---|---|---|---|---|
| " | 7.00 | " | " | were | 1¾ | inches | " " " |
| " | 8.00 | " | " | " | 6¾ | " | " " " |
| " | 9.00 | " | " | " | 11¼ | " | " " " |
| " | 10.00 | " | " | " | 15¼ | " | " " " |
| " | 11.00 | " | " | " | 18¼ | " | " " " |
| " | 12.00 | " | " | " | 20 | " | " " " |
| " | 1.00 | A. M. | " | " | 21¼ | " | " " " |
| " | 2.00 | " | " | " | 21 | " | " " " |
| " | 3.00 | " | " | " | 22 | " | " " " |
| " | 4.00 | " | " | " | 22½ | " | " " " |
| " | 5.00 | " | " | " | 23¾ | " | " " " |
| " | 6.00 | " | " | " | 23 | " | " " " |

at which time the water commenced to flow over the outlet of the spring and continued to do so, the spring keeping up in its volume.

At 9.10 A. M. November 14 the pumping was started in well No. 3 and continued until six o'clock Monday morning, when it stood one-eighth of an inch higher than when the pumping was started at nine o'clock of the day previous, overflowing from said spring; and the ground in the immediate neighborhood was wet, showing that water was also issuing out of the ground in other places than in the spring. The water also commenced to flow voluntarily from well No. 2 about two or three o'clock A. M. on Sunday and continued to flow until the two men appointed for the purpose, left.

On the afternoon of Monday, November 15, some time after two o'clock, the court permitted the defendant company, under voluntary arrangements made, to commence pumping No. 2, and by evening the spring had

gone down until it was about dry. And it clearly appeared that the pumping from well No. 3 up to the present, has not in any way affected the flow of this spring, but that pumping from Nos. 1 and 2 together or separately, does affect it, and, if continued, dries it up. Under ordinary conditions, from the experience relative to the pumping of these wells, there would be no perceptible diminution of the flow of the water in the spring in question, but this fall has been extraordinarily dry and the effect of said pumping has at least drawn so heavily upon this body of water beneath the earth that it has affected the flow of water to this spring.

The geological formation of the earth in this vicinity is a dipping of the rocks from the south and from the north, coming together about where the Aquashicola creek is and forming at this point a basin or valley. The Ross Common spring is on the side of the rock formation dipping north and the wells of the defendant company are on the side of the rock formation dipping south, and from the appearances there is a well-defined fracture in the rocks, whereby the waters below have found an easy outlet, and the source of the supply of the Ross Common spring is a water course under the surface of the earth along the fracture zone, and so plain, that taken in connection with the tests made and the chemical analysis of the water, it may be concluded as a fact, and not as a guess, that the supply of the water of said spring does not come from the ordinary percolations through the earth, the water seeping its way through, but comes from a well-marked and easily discernible water course, and wells Nos. 1 and 2 are driven into the same water course and, when operated, pump the water in such quantities as to divert it in a dry time from the said Ross Common spring and deprive its lessees of the use thereof, materially injuring the business of the plaintiff company.

*Error assigned* was decree continuing preliminary injunction.

*Edward J. Fox*, with him *F. B. Holmes*, for appellant.

*A. Mitchell Palmer*, with him *C. R. Bensinger*, for appellee.

PER CURIAM, May 9, 1910:

This appeal is from a decree continuing a preliminary injunction restraining the defendant from operating its pumps in such a manner as to substantially decrease the flow of water into the plaintiff's spring.   The case was very fully considered by the learned judge of the common pleas and the injunction was carefully worded so as to preserve the status quo without unnecessarily restricting the defendant in the exercise of its franchises.   The established practice of the court on an appeal from the granting or refusal of a preliminary injunction is to withhold any expression of opinion on the merits of the controversy until after final hearing and decree and to determine only whether on the facts developed an injunction should have been granted or refused.

The decree is affirmed at the cost of the appellant.